IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SAMUEL S. UPTHEGROVE,

      Plaintiff,

    v.

LESLIE BAIRD, KURT SCHWEBKE,
CO ISAACSON, CO SWENSON,
CO MILLARD and SGT. HART,

      Defendants.

OPINION and ORDER

Case No.  15-cv-509-wmc

---

*Pro se* plaintiff Samuel S. Upthegrove is proceeding in this case on claims that security and medical staff at the Columbia Correctional Institution ("CCI") violated his rights under the Eighth Amendment by failing to protect him from self-harm on June 7, 2010.  Before the court is a motion for partial summary judgment filed by two of the defendants:  Leslie Baird and Kurt Schwebke.  (Dkt. #11.)  In the order below, the court denies that motion because there are genuine disputes of material fact that must be resolved by a jury.  The court also denies a motion filed by plaintiff for assistance in recruiting counsel (dkt. #20) because he has not shown that the complexities of this case exceed his ability to litigate it.  Accordingly, this case shall proceed to trial as scheduled.

UNDISPUTED FACTS[1]

**A.    The Relevant Parties For Pending Motions**

At all times relevant to this lawsuit, plaintiff Samuel Upthegrove was confined by the Wisconsin Department of Corrections at CCI.  Dr. Kurt Schwebke was employed as a psychologist at CCI from November 2003 until June 2011, and then again from

---

[1] The court finds the following facts material and undisputed unless otherwise noted.  The facts are drawn from defendants' proposed findings of facts and plaintiff's responses.

December 2011 until August 2012.   Lesley Baird was employed as a psychological associate at CCI from May 24, 2010 until October 8, 2011.

**B.      Segregation and Observation at CCI**

CCI has three segregation units:  Disciplinary Segregation 1 (DS1); Disciplinary Segregation 2 (DS2); and the Special Management Unit (Unit 7).  DS1 houses inmates who (1) have just arrived in segregation, or (2) are having behavioral problems.  DS1 includes observation cells located in the back of the unit in close proximity to the officer's station or "bubble," which allows the officers to monitor those inmates more closely.  DS2 is a "step-down" unit that houses inmates who have been in DS1 and shown a positive adjustment in their behavior.  Finally, Unit 7 serves a variety of purposes, but mainly houses mentally ill and vulnerable inmates.

Observation status is very restrictive and used for the purpose of preventing an inmate from inflicting harm upon himself or someone else.  An inmate may be placed in observation status by a clinician, crisis intervention worker, physician, the Warden, a registered nurse, or physician's assistant, when he threatens or engages in acts of self-harm.  An inmate may also be placed in observation status by the security director or shift captain for the same reasons if a clinician, crisis intervention worker, or physician is not available for consultation either directly or by telephone.

Each segregation unit has an assigned psychologist or psychological associate. Psychological staff members conduct routine rounds in the segregation units, during which they go to an individual cell front and talk to the inmate.  Psychological staff may see an inmate at his cell front more than once a week if staff or the inmate requests it.

2

While Dr. Schwebke worked at CCI, he was regularly assigned to provide services to inmates on the DS1 unit.  In evaluating the risk of and potential treatment for self-harm by an inmate in segregation, Dr. Schwebke considered factors such as the inmate's history of self-harm, motivational purposes of self-harm, frequency of thoughts of self-harm, specific plan by the inmate for self-harm, potential for the plan to be lethal, extent of intent to self-harm, opportunity for self-harm, family contact or support, degree of narcissism, future orientation, future plans and goals.  Options for addressing potential self-harm vary depending on the particular individual, but could include observation placement, restraints, or reference to the institution psychiatrist regarding the use of psychotropic medications.

**C.     Upthegrove's History of Self-Harming Behavior**

Upthegrove has a long history of self-harming behavior while incarcerated, including cutting, biting and scratching himself, as well as swallowing objects.  At various times, he had been prescribed Geodon, a psychotropic medication intended to assist him with improved coping skills and better control his emotions.

Dr. Schwebke was aware of Upthegrove's history of self-harm, but did not believe that Upthegrove was at risk of any potentially lethal, self-harming behavior, such as attempted hanging or infliction of severe wounds.[2]   Upthegrove's acts of self-harm have periodically required medical treatment, though in Dr. Schwebke's experience working with Upthegrove, he would usually alert staff when engaging in serious self-injury.

---

[2] Upthegrove reports having previously attempted suicide by overdosing, attempted hanging and severe lacerations.  There is no evidence, however, that defendants Schwebke or Baird were aware of any of these previous suicide attempts.

3

During the time he worked with Upthegrove, Dr. Schwebke believed that Upthegrove's acts of self-harm were voluntary, controlled, and done for secondary gain. In particular, Dr. Schwebke believed that while Upthegrove was being housed on DS1 for observation, his actual goal was to be transferred back to Housing Unit 7, where he would be eligible for step 2 segregation time, or to be transferred to Wisconsin Resource Center for treatment. Dr. Schwebke also thought Upthegrove wanted to be placed in observation status because he hoped to receive a more favorable disposition on pending conduct reports or court cases. Not surprisingly, Upthegrove denies that he was motivated by any potential secondary gain when he engaged in self-harming behavior or requested to be placed in observation.

On May 31, 2010, Upthegrove engaged in an act of serious self-harm, and he continued to threaten self-harm. As a result, he was placed in observation status on June 1, 2010. Dr. Schwebke evaluated Upthegrove the morning of June 2, concluding that he no longer presented a risk of harm to himself and recommending that he be released from observation status. For the moment, Upthegrove nevertheless remained placed in DS1. Upthegrove was later seen by a different psychologist at CCI on June 3 for "24-hour, post-observation follow-up." wherein it was noted Upthegrove was pleased to be out of observation status and was working on an unrelated legal case involving Mendota Mental Health. He also discussed short and long term goals, appearing to be future oriented.

## D.    Upthegrove's Self-Harming Incident on June 7, 2010

Dr. Schwebke saw Upthegrove again on the morning of June 7, 2010, at his cell front in DS1 at around 8:15 a.m. The parties dispute whether Baird was also present.

4

Upthegrove states in his declaration that Dr. Baird was present, while both defendants deny Baird was on DS1 at all on June 7. Defendants also point out that the DS1 log book has no record of Baird being on the unit.

On the 7th, Dr. Schwebke found Upthegrove was irritable and upset, and he complained about several current problems, including his legal case, restrictions in property and recreation, family concerns, and restitution owed to Mendota Mental Health Institute. Upthegrove also reported being upset and frustrated, with the urge to harm himself. According to Dr. Schwebke, however, Upthegrove never articulated a method or specific plan of how he would harm himself and calmed down after talking about his concerns. Additionally, Upthegrove was on a "sharps" restriction, his medications were being monitored, and he was being given only bagged meals without utensils.

Thus, Dr. Schwebke did not question Upthegrove further about what objects he may have in his cell that he could use to harm himself. Schwebke also believed Upthegrove would not harm himself because: he appeared to be "future oriented," motivated to resolve problems with his family, and was looking forward to the lessening of his restrictions and placement off the unit. Dr. Schwebke believed moving Upthegrove to observation would also have upset him even further because he would have had restrictions on his recreation schedule and all of his personal property would likely have been taken away. Having access to recreation periods and property had seemed to help Upthegrove cope better with stress in the past.

Upthegrove disputes the defendants' version of events, stating that during this period, he told Dr. Schwebke and his associate Baird repeatedly that:   (1) he was planning on cutting himself; and (2) he did not care if he lived or died.   When Schwebke told Upthegrove that he should use his coping skills instead, Upthegrove replied that cutting himself was his only coping skill, that cutting himself was the only thing that would stop the pain, and that he had no reason not to cut himself.   When Schwebke asked, Upthegrove says that he refused to confirm or deny whether he had something with which to cut himself.   According to Upthegrove, Dr. Schwebke and his associate Baird then left, telling Upthegrove that they hoped he would not cut himself.

Later on June 7th, Upthegrove proceeded to cut himself on his arm with a pen insert.   He was taken to Divine Savior Hospital for treatment.   When he returned, Dr. Schwebke placed Upthegrove on observation status and talked with him about the incident.   Upthegrove was released from observation and returned to DS1 on June 10, 2010.

## OPINION

### A.    Defendants' Summary Judgment Motion.

The Eighth Amendment imposes a duty on prison officials not only to provide "humane conditions of confinement," but to insure that "reasonable measures" are taken to guarantee inmate safety and prevent harm.  *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994).   An inmate may prevail on a claim under the Eighth Amendment by showing that the defendant acted with "deliberate indifference" to a "substantial risk of serious

harm" to his health or safety. *Id.* at 836. Attempted suicide and other forms of significant self-harm constitute such harm. *See Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010). Deliberate indifference to a risk of self-harm is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently" harm himself, yet "fail[s] to take reasonable steps to prevent the inmate from performing the act." *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775-76 (7th Cir. 2014) (citations omitted). *See also Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies.").

Plaintiff was granted leave to proceed on claims that defendants Baird and Schwebke, as well as other defendants, were aware that plaintiff was feeling self-destructive on June 7, 2010, but failed to take reasonable measures to prevent him from harming himself, such as placing him on observation status.[3] For the purposes of summary judgment only, defendants Schwebke and Baird concede that the cuts plaintiff made on his arms on June 7, which required treatment at the local hospital, posed a substantial risk of serious self-harm. Nevertheless, they argue that summary judgment is appropriate because plaintiff cannot prove that either Schwebke or Baird acted with deliberate indifference to a substantial risk of serious harm. Specifically, they argue that plaintiff cannot show that: (1) Baird interacted with plaintiff at all on June 7 or was in

---

[3] Plaintiff was also granted leave to proceed on claims against defendants CO Isaacson, CO Swenson, CO Millard and Sergeant Hart relating to self-harming incidents on June 7 and 8, 2010, but defendants have not moved for summary judgment on those claims.

any way involved in the decision not to place him on observation that day; or (2) Dr. Schwebke actually believed that plaintiff was going to harm himself.

The trouble with defendants' motion is that it is premised on genuine, material factual disputes between the parties regarding what actually happened on June 7, 2010. With respect to Baird, defendants argue that she has no recollection of seeing plaintiff on June 7, nor is there any documentary record of her being on DS1 on that day. Plaintiff's sworn declaration that Baird *was* present at his cell front with Schwebke on that day, however, is evidence sufficient to create a genuine dispute of material fact. Therefore, Baird is not entitled to summary judgment based on her claimed lack of personal involvement on June 7th.

With respect to whether defendants were deliberately indifferent to a substantial risk that plaintiff would seriously harm himself that day, defendants argue that Dr. Schwebke reasonably believed that plaintiff was not at serious risk of harming himself because: (1) plaintiff calmed down after talking with Schwebke; (2) plaintiff never specified any plan or means of harming himself; (3) plaintiff was on property restrictions that would help protect him from harming himself; (4) plaintiff seemed future oriented; and (5) plaintiff was likely seeking to be placed on observation for secondary reasons, such as being transferred to a different unit or institution. Additionally, Schwebke believed plaintiff being placed in observation may exacerbate his stress levels, as plaintiff would have been deprived of property and recreational opportunities.

Certainly, if a jury believed defendants' version of events, it could reasonably conclude that defendants should not be liable under the Eighth Amendment. But again,

plaintiff's version of events differs in material ways.  Most significantly, plaintiff says he *repeatedly* told Schwebke and Baird that he intended to cut himself and did not care whether he lived or died.  Contrary to Schwebke's version of their conversation, Upthegrove also says that he *refused* to answer when asked whether he had the means to harm himself.  Despite telling them that cutting was his only coping mechanism, he further claims that Schwebke and Baird simply left, telling him that they "hoped" he did not cut himself.

The court is sadly aware of the risk that all of these representations by Upthegrove are not only self-serving, but potentially manipulative conduct and that allowing Upthegrove to proceed may well be counterproductive to his longer term recovery.  *See Goodvine v. Ankarlo,* 9 F. Supp. 3d 899, 948 (W.D. Wis. 2014).  Nevertheless, if  a jury were to believe plaintiff's version of events, it may reasonable conclude that defendants deliberately ignored his repeated statements that he was going to cut himself, thus acting with deliberate indifference to a substantial risk of serious harm.  Because these factual disputes cannot be resolved at summary judgment, but can only be resolved by a jury, the court must deny defendants' motion for summary judgment.

**B.     Plaintiff's Motion for Assistance in Recruiting Counsel.**

The final matter pending before the court is plaintiff's motion for assistance in recruiting counsel to represent him at trial in this case.  Although civil litigants like plaintiff have no constitutional or statutory right to the appointment of counsel, *e.g.*, *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013); *Luttrell v. Nickel*, 129 F.3d 933, 936 (7th Cir. 1997), the court has the discretion to recruit a volunteer in an

appropriate case.  Here, plaintiff requests that the court recruit counsel for him because: (1) he has never represented himself at a trial, much less before a civil jury; (2) this case involves multiple claims against multiple defendants; and (3) he suffers from serious mental health issues and self-harming behaviors, including borderline personality disorder and depressive disorder, that will make it difficult for him to present his claims.

After reviewing the materials plaintiff has submitted, however, the court concludes that his case does not present the sort of circumstances that would justify recruitment of counsel.  Specifically, the court is not persuaded that the complexity of this case exceeds plaintiff's ability to present it to a jury on his own.  *See Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007).  Plaintiff is an experienced litigator and has demonstrated a strong understanding of the factual and legal issues relevant to his claims in this case.  Although plaintiff says that his mental health issues will make it difficult for him to present his claims in a trial setting, the court has seen no evidence thus far that any mental health issues have interfered with this litigation.  To the contrary, plaintiff's submissions have been well-reasoned and easy to understand.  Finally, and perhaps most significantly, plaintiff's claims in this case (including those not at issue in this summary judgment opinion) will essentially come down to a credibility contest.  Plaintiff alleges that defendants disregarded his statements suggesting that he was at substantial risk of harming himself, while defendants either deny that plaintiff made those statements or deny that they ignored him.  Accordingly, plaintiff's primary task at trial will be to present his version of events to the jury.

Certainly, *pro bono* counsel may be able to present plaintiff's case more effectively than plaintiff can (for example, with respect to the cross-examination of defendants). But "if that were the test, district judges would be required to recruit counsel for every indigent litigant." *Pruitt*, 503 F.3d at 655 (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006)) (internal quotation marks omitted). This court receives many more requests for counsel than the small pool of available volunteers can accommodate. Based on all the facts and circumstances before the court at present, neither the case itself nor plaintiff's personal circumstances suggests that he is unable to try it on his own. Accordingly, the court will deny the motion for assistance in recruiting *pro bono* counsel.

In order to assist plaintiff in trial preparation, the court will hold an earlier in-person final pre-trial conference and also refers plaintiff to the parties' obligations for submissions laid out in the attachment to the court's Preliminary Pretrial Conference Order (dkt. #10), which are also attached to this order for plaintiff's convenience.

ORDER

IT IS ORDERED that:

1. Defendants' motion for partial summary judgment (dkt. #11) is DENIED.

2. Plaintiff's motion for assistance in recruiting counsel (dkt. #20) is DENIED.

3. In light of plaintiff's pro se status, an in-person final pretrial conference will be held on Wednesday, February 22, 2017, at 1:00 p.m.

Entered this 4th day of January, 2017.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge